**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

GETTY PROPERTIES CORP, ET AL.,

                                       CIVIL ACTION NO.

                                       3:12-CV-00865-AWT

   PLAINTIFFS

             V.

TUNIXS-OHR, INC., ET AL

DEFENDANTS                                  JUNE 17, 2012

### DEFENDANT HSTN, LLC and RENALDI'S GETTY, LLC's  MEMORANDUM IN OPPOSITON TO APPLICATION FOR INJUNCTION

On June 12, 2012, the plaintiff made application to this Court for a Temporary Injunction pursuant to FRCP 65.  The Defendants hereby submit their opposition to that application.  For reasons set forth herein, the defendants submit that the plaintiffs' application should fail because far from showing a substantial likelihood of success on the merits, there is little likelihood of success at all; there is no irreparable harm to the plaintiffs (unlike the defendants); and, the decided balance of the hardships favors the

1

defendants.  Accordingly, the defense submits that no injunction should enter.

In support, the defense submits that the plaintiff incorrectly states the facts and the law.  Indeed, some representations made by the plaintiffs are so shocking that they appear almost deliberately misleading.

BACKGROUND

This action is the latest installment in litigation between Getty and its dealers which resulted from the bankruptcy of Getty Petroleum Marketing, Inc. (hereinafter "GPMI") In re: Getty Petroleum Marketing, Inc. et. al, Case No. 11-15606 (SCC). (hereinafter bankruptcy court documents shall be indicated by brackets). The court is aware of the prior action filed by the dealer defendants, United Dealers of CT v. Green Valley Oil, LLC, et al., 3:12-CV-00474-AWT.  The plaintiffs have also filed over 30 summary process claims in the Connecticut Superior Court.

The defendants HSTN, LLC and Renaldi's Getty are each members of United Dealers of CT, an unincorporated association of small businesses, each of which is independently owned.  The dealers potentially effected by the proposed injunction are, as of June 17, 2012:

2

P&M Petromart, LLC; Sapphire Enterprises LLC; Gaye's Limited LLC ; Madison Ave Mart LLC; H & A Convenience LLC;  Hawars Park Ave LLC ; Adnan Rahim; RHS LLC; Bristol Gas LLC; Superior Service Inc ; Pakam Services LLC d/b/a Cheshire Getty; Surya, Inc.; Mehar Petro Inc; Noroton Service Station, Inc.; HSTN LLC; JanRisk Capital LLC; JD Foodmart LLC; SSAW LLC d/b/a BP; Shamama Enterprises, Inc. d/b/a Sana Gas; One Stop Mart LLC; JZ Mart LLC d/b/a BP of Milford;  Indtur LLC ; Navjot Enterprises, Inc.; UNHK LLC; 331 West Ave Gas Sts LLC; Expert Auto Repairs LLC d/b/a B & B Getty; Savi 2 LLC; Renaldi's Getty LLC; Stateline Getty, Inc.; Pamby Motors, Inc.; ATKR LLC; Zs Ent. LLC; MICA Ent. Inc. d/b/a Shippan Point Conv.; West Broad Svc Center LLC d/b/a West Broad Getty; Bodaeve, Inc. d/b/a Bull's Head Service;  Tolland C Store LLC;  J & J Car Care Center, Inc. d/b/a Westport Getty; Wilton Service Center, Inc. d/b/a Wilton Auto & Tire; Wolcott BP LLC (collectively, the "United Dealers")

The dealers provide jobs to numerous individuals with families to support, and deliver automotive fuel and other goods and services to the people of Connecticut.  The proposed injunction, if entered, will shut down these stations and effectively deprive the named defendants and the other United Dealers and their employees of their livelihood and likely cause a disturbance to transportation channels in the greater Connecticut area.  Moreover, the proposed injunction, if entered, will likely result in countless bankruptcy filings on behalf of the United Dealers and possibly their employees.

3

The Plaintiffs' claims are almost entirely based upon a Bankruptcy Court order entered on or about April 2, 2012 which "So Ordered" the Master Lease Stipulation [Doc. No. 348]. The Master Lease Stipulation is unambiguous regarding the rights of third party tenants and occupants thereto. The Master Lease Stipulation expressly provides, as due process and other rights under the United States Constitution almost certainly would have otherwise required, that: **"Notwithstanding any other provision herein, this Stipulation and Order is without prejudice to any rights that third party tenants or occupants of the Premises have (if any) as of the date of this Stipulation and Order under applicable law."** (Id., ¶ 21). (Emphasis added). While the Master Lease Stipulation purports to require <u>the Debtors</u> (i.e. GPMI) to, <u>inter alia</u>, "immediately and without further action or proceeding or order of this Court relinquish possession and deliver the Premises [as defined therein] to Getty Properties or as Getty Properties shall direct, in the condition required by the Master Lease, free and clear of all liens and encumbrances suffered or incurred by the Debtors . . . and free and clear of all other tenancies and occupancies . . . ."; (Master Lease Stipulation, ¶ 4(c)). However, this agreement between the GPMI and Getty Properties was without prejudice to the rights of the United Dealers (See Master Lease Stipulation, ¶21). Similarly, while GPMI purportedly agreed subject to Court approval

4

to allow Getty Properties "(i) . . . to immediately evict the Debtors and any and/or all other persons or entities occupying the Premises . . . and (ii) in state or other court, to: (A) obtain and/or enter an immediate judgment of possession, order of ejectment or similar order or judgment . . . in favor of the Getty Properties against the Debtors and any all other persons or entities occupying the Premises by summary proceeding,"; (¶4(c)), this agreement between the GPMI and Getty Properties also was without prejudice to the rights of the United Dealers (See Master Lease Stipulation ¶ 21).

Other related documents are:  On or about April 20, 2012, the Official Committee of Unsecured Creditors (the "Committee") filed a Motion of the Official Committee of Unsecured Creditors for an Order Rejecting the Master Lease With Getty Properties (the "Rejection Motion") [Doc. No. 367], on April 20, 2012 filed an Addendum to The Rejection Motion [Doc. No. 384] and Supplemental Notice of Hearing on the Rejection Motion [Doc. No. 385].  Critically, neither the Rejection Motion, the Addendum to The Rejection Motion, the Supplemental Notice of Hearing on The Rejection Motion, nor the Bankruptcy Court's Order Rejecting Master Lease With Getty Properties [Doc. No. 416], purports to empower the plaintiff Getty Properties to shut down the United Dealers or otherwise impair the United Dealers' rights as against Getty Properties or anyone else, other than GPMI and the

other debtors, in contravention of state law.

After the court order, the plaintiffs produced to each dealer a document they describe as a "revocable license agreement." However a reading of that document discloses that it is a forfeiture agreement rather than a license agreement. Those who signed the document, forfeit their franchise rights, forfeit their tenancy rights, forfeit their right of first refusal, forfeit their right to buy product, and, forfeit their right to choose supplier. Further, the agreement imposes a new obligation that the licensee surrender the site free and clear of any contamination. In other words, the agreement entails a forfeiture of those rights that dealers have and imposes obligations that they didn't.  The defense respectfully submits that the only reason such a document would be created is to foreclose the rights reserved by the bankruptcy court.

**A) The plaintiffs cannot show a substantial probability of success on the merits because the dealers have the right to remain in their stations as tenants and have further rights under Conn. Gen. Stat. § 42-133mm.**

The plaintiffs' action is almost entirely dependent upon a conclusion reached about  the Bankruptcy Court's activity which is simply wrong.  More particularly, the

plaintiff's entire action is predicated upon the misapprehension reflected in paragraph 6

of the Shea affidavit.  Mr. Shea stated:

> "Upon information and belief, as a result of the GPMI bankruptcy and the
> rejection of the master lease and the GPMI/GVO lease, the leases of all
> the Connecticut Getty operators, including defendants, terminated as of
> April 30, 2012 and the properties, including the underground storage
> tanks, piping and dispensing pumps located at the stations, reverted to
> Getty Properties." Affidavit, at para. 6.

That reading is totally insupportable under both the Bankruptcy Court Orders and

Connecticut law.  As set forth hereinabove, the bankruptcy order expressly protected

the dealers from ouster and reserved to them all of their rights under applicable law.

Accordingly, those rights were certainly not terminated by the Bankruptcy Court.

Further, the dealers' rights were not terminated under generally applicable

bankruptcy law. Under long-standing Second Circuit precedents, a lease cannot be

unilaterally disturbed by a debtor landlord. In re: Minges, 602 F. 2d 38 (1979). In a case

much like the case at bar, the Bankruptcy Court for the Western District of New York

explained that the bankruptcy act "provides that upon rejection of a lease of

nonresidential real property by a debtor, qua lessor, the leasee may  remain in

possession for the balance of the lease term to the extent permitted under applicable

7

non-bankruptcy law." In re: Dial-a-tire, Inc., 78 B. R. 13, 16 (1987) (citing section 365 (h)(1) of the bankruptcy act). That court also noted that where the debtor is only a leasee, it would have to surrender the real property. Id.  So, if there is no subtenant, the landowner would obtain a fee simple, but where there is a subtenant, the landowner only obtains the reversionary interest.  Although the Western District of New York characterized this outcome as an anomalous results, it makes perfect sense under real property law.

Generally speaking, under modern property law, when the owner of real property leases it for a term of years, he or she carves the fee simple interest into two chronological estates: the tenant receives a present possessory estate, and the landlord retains only a future reversionary estate. Generally, both the tenant's interests and the landlord's interests are transferable. Ararat Miracle, LLC v. R/T Speed Inc., 49 Conn. L. Rptr. 818 (2010). The Connecticut Supreme Court has described a lease transaction as a transfer of an estate in real property to the tenant first a stated period with a reversion in the owner after the expiration of the lease. It's distinguishing characteristic is the surrender of possession by the landlord to the tenant so that he may occupy the land or tenement leased to the exclusion even of the landlord himself.

8

Monarch Accounting Supplies Inc. V. Prezioso, 170 Conn. 659, 663 (1976). Accordingly, the only thing controlled by Green Valley Oil or GPMI at the time of the rejection was the reversionary interest. They could not convey to Getty Realty a greater interest than they themselves had. Since they had no right to evict the dealers, Getty Realty gained no such right after the transfer.

The Connecticut Supreme Court had the opportunity to review a set of facts stunningly similar - if not identical - to the case at bar. In Bargain Mart, Inc. V. Lipkis, 212 Conn., 120 (1989), there was a dispute between a subtenant and a landowner with respect to control over a unit in a shopping mall. In that case, Bargain Mart occupied a retail unit under a sublease. It' sub-lessor took its rights under a lease with the original landowner which lease was assigned to an entity which became a debtor in bankruptcy. The debtor's lessor tried to force the Bargain Mart out by cutting off utilities, shutting off heat and generally making life difficult. Bargain Mart successfully sued to enforce its leasehold rights notwithstanding a settlement entered by its landlord and the rejection of the lease by the lessor once removed from Bargain Mart.

The Connecticut Supreme Court held that the rejection of a lease in bankruptcy was not a termination but rather a voluntary surrender of the lease. Id. at 126. The

9

Court further held that under Connecticut law the surrender of a lease by a lessee/sublessor to its lessor will not be permitted to defeat the estate of the subleasee. Id.at 127. The Court further found that a stipulation which is "so ordered" by a court merely places the court's imprimatur on a settlement of the controversy between the parties. Id. at 135. Accordingly, both the stipulated judgment and the bankruptcy rejection were voluntary surrenders rather than the termination of the lease. The sublease remained undisturbed and valid.

The tenant, Bargain Mart, became the tenant of the landowner under the terms of its original lease with the sub lessor. It may well be said that the bargain Mart case is "on all fours" with the facts at bar (at least if we consider the worst-case scenario). Accordingly, under the Bargain Mart precedent, the dealers in this case are entitled to become the tenant's of Getty Realty under the terms of their original lease with Green Valley Oil. The result should be the same.  The property owner should not be allowed to interfere with the tenants' ability to run their businesses and to shut off utilities, the supply of fuel or any other aspect of the business. The plaintiffs are interfering with the dealers contrary to law.

10

## Conn. Gen. Stat. § 42-133mm

In addition to their Bankruptcy and common law leasehold rights, the dealers in this case have **additional** rights that the tenants in <u>Bargain Mart</u> did not have. As franchisees of Green Valley Oil, the dealers have a right of first refusal of Green Valley Oil's rights. Once GVO determined to surrender its rights to GPMI in January of 2012, the defendants' rights vested. Again, GPMI, Getty Realty, and NEGC could only obtain those rights which their transferor had. Accordingly, the dealers not only retain the rights under their present lease terms but also all rights that Green Valley Oil had. Upon information belief, they are entitled to assume a 49 year ground lease on their stations.

## The dealers properly unbranded

As this court is well aware, the dealers have been subjected to grave abuse as a result of the oil companies' inability to amicably resolve their disputes. They have been without supply of gasoline for extended periods over the last several months. Ultimately, Green Valley Oil became entirely unable to supply any product whatsoever. As a result, the dealers obtained their own supply. In order to do so, they removed all indications that the gasoline sold was BP or Getty as appropriate and they prominently

11

posted signs on each pump advising their customers that the product pumped was not

Getty or BP product. In the moving papers, the plaintiffs submitted a number of

photographs which demonstrate the de-branding efforts made by the defendant

dealers. Careful review of those photographs demonstrates not a single appearance of

Getty name, the BP name or the BP stylized  green angular sun.   This is very likely

because, despite all the plaintiff's best efforts, the oil company <u>could not find even one</u>

<u>single instance</u> of a dealer claiming that the product in their tank was anything other

than unbranded.

      Seemingly the best they could do was green paint.  Although not stated, we

suspect that the plaintiffs are claiming that the color scheme is so distinctive that all

customers would believe that gas pumped from a station with green paint was BP

product. The defendants respectfully submit that claim is absurd. There are other

gasoline companies which use green.  It is equally possible that the prior "branded

partner" at the station was Hess or Diamond Shamrock for instance.  Further, to the

extent that any conceivable confusion might possibly have existed, that confusion would

be immediately dispelled by the prominent signs placed by dealers. (Examples of those

signs are attached hereto as exhibit A.). Simply put, the dealers' debranding efforts far

exceed industry standards and certainly comply with the requirements of state and federal law.

Further, the gasoline industry is certainly different than other industries. Red white and blue is used by Amoco, Chevron, Arco, Mobil, Citgo, Exxon, 76, Irving, Marathon, Costco and many other companies branded and unbranded. Yellow is used by Shell, Sunoco, Buckley, Standard, and others. Red and white is used by Getty, Texaco, BJ's and others. In other words a mere color scheme is not enough to confuse customers without more. This is also true in other industries. For instance, the defense notes that the John Deere Co. lost its claim that the colors green and yellow in its trade dress could not be used by a competitor. Deere & Co. v. MTD Holdings, Inc. 2004 WL 324890 (SDNY 2004).  The green and yellow John Deere logo is at least as prominent as the BP trade dress. BP should not be granted any greater protection in this industry than John Deere was given in the garden products industry.

Further, other than the bald statement that there might be customer confusion, the plaintiffs have offered nothing to suggest that any actual confusion; any threat of actual confusion; or, even any real possibility of actual confusion. Again, this is likely because as stated hereinabove, the defendants have exceeded industry standard in

13

their de-branding efforts. Certainly, the plaintiffs are going to have to show something more than their bald assertions, whether by expert testimony or otherwise, that the potential for customer confusion exists. They have made no showing to date and they're not likely to do so - ever. In this case, there's ample evidence to demonstrate that all signage was covered and that additional warnings were given. Customers simply were not confused by color.

For all the foregoing reasons, the plaintiff is unable to show a substantial probability of success on the merits. In fact, the Defense respectfully submits that the defendants will succeed and that their rightful tenancies shall be acknowledged by this Court.

## B) REQUIREMENTS FOR GRANTING OF INJUNCTIVE RELIEF UNDER FRCP 65

Rule 65 case law has developed two formulae upon which an injunction could be based.  It is generally held that injunctive relief under F.R.C.P. 65 may be granted either upon a showing of probable success on the merits coupled with possible irreparable harm; or by demonstrating a sufficiently serious question on the merits and a decided balance of the hardships in favor of the movant.  *See* Phillip v. Fairfield University, 118 F.3d 131 (2d Cir. 1997); Jayaraq v. Scappini, 66 F 3d 36 (2nd Cir. 1995); Branson v.

14

<u>Ultrasonics Corp. v. Stratman</u>, 921 F.Supp. 909 (D.Conn. 1996).

The formulations clearly vary based upon the magnitude of the harm which will be suffered; the more severe the hardship, the less stringent the requirement to show likelihood of success.  For the following reasons, the defendants submit that under whatever formulation of the Rule 65 standard, no injunction should issue.

As set forth hereinabove, the undersigned represents over 40 Connecticut service station dealers.  These dealers respectfully submit that the order before the Court should be denied based upon law, equity and good conscience.  As set forth hereinabove, the legal basis upon which the motion is based is tenuous at best.  The bankruptcy court order relied upon by the plaintiffs expressly protected these dealers' interests.  Getty Properties offers no basis upon which this Court should retreat from that position, and in any event to strip these dealers of their procedural and substantive rights required by due process.

There is no dispute that prior to May 1, 2012, these dealers peaceably occupied and operated their service stations.  They did nothing to warrant being dispossessed of their businesses, their life savings, and rendered destitute.  The record reflects that these dealers are being hauled into court solely because major oil companies could not

15

amicably resolve their disputes.

While the movant would suggest that the annihilation of the dealers is merely an unfortunate circumstance of modern business, it is far from that.  The Proposed injunction before the Court represents nothing less than a request that this Court apply the full force of the United States government to shut down innocent dealers' businesses.  In support, Getty Properties suggests no compelling prejudice which would be visited upon it if the order does not enter.  It suggests no litany of horribles.  That is likely because no such prejudice exists.

In contrast, if the requested relief is granted, the dealers will not only lose their business, they may also lose their personal property.  Certainly, over 40 gasoline service stations will go dark to the benefit of no one except Getty Properties.

For all the foregoing reasons, the dealers should be afforded the right to assert all of their rights under all applicable law.  This court should not countenance Getty Properties' attempt to contort the law to achieve ends which are obviously inequitable. The 40 plus dealers of United Dealers of Connecticut respectfully request this Honorable Court to deny the requested relief and allow the parties to adjudicate their rights under applicable state law.

16

**1.   THE DEFENDANTS WILL SUFFER IRREPARABLE INJURY.**

It is well settled that the loss of Franchise rights is, per se, an irreparable injury. Stenberg v. Checker Oil Co., 573 F.2d 921 (6th Cir.1978);  Gilderhus v. Amoco Oil Co., 470 F.Supp. 1302, 1304 (D.Minn.1979); Milsen Co. v. Southland Corp., 454 F.2d 363 (7th Cir.1971); Wojciechowski v. Amoco Oil Co., 483 F.Supp. 109, 116 (1980).  The Second Circuit has repeatedly held irreparable harm where a party is threatened with the loss of a business. Tom Doherty Associates, Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995).  In Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir.1970), a father-and-son car dealership was threatened with termination of its franchise by the manufacturer. The Court affirmed a finding of irreparable injury on the grounds that termination of the franchise would "obliterate" the dealership and that the right to continue a business "is not measurable entirely in monetary terms." Id. at 1205; see also Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co., 749 F.2d 124, 125-26 (2d Cir.1984) (per curiam) (finding irreparable harm from loss of "ongoing business representing many years of effort and the livelihood of its husband and wife owners").

17

The defendants will not only lose their franchise rights but they will also be deprived of their day in Court.  Plaintiffs trying to pre-empt the summary process litigation now pending in Connecticut Courts and by "end around" preclude the dealers from operating their businesses before they are even proven to have done anything wrong.  If this attempt is successful some of the underlying claims might be moot and the defendants will never have their day in Court.  Termination before being given the opportunity of vindication is not only irreparable harm, it's just not right.

## 2.   THE BALANCE OF THE HARDSHIPS WEIGHS DECIDEDLY IN FAVOR OF THE DEFENDANTS.

There can be no reasonable dispute that the hardships balance decidedly in defendants' favor. If an injunction is issued, the plaintiffs will simply continue receiving rental payments and they will continue to make those profits to which they are entitled. In contrast, if the injunction issues, the defendants will face immediate and immeasurable harm resulting from being driven out of their businesses.

18

**C) In addition to the procedural and substantive arguments made hereinabove, deep plaintiffs request for an injunction should be rejected by this Court under the prior pending action and abstention doctrines**

As the Court is aware, there is already a case pending in this Court regarding the transaction at bar. Further, there are over 30 actions in the Connecticut Superior Court. In this latest case, the plaintiff are blatantly seeking to do an "end around" all other actions and put the dealers out of business by way of a collateral attack on their supplier.

The defense respectfully submits that the court should not tolerate such a collateral attack under any circumstances. The defendants further submit that the action should be stayed pending the resolution of the property disputes in the Connecticut Superior Court. In support, the defendants submit that under <u>Colorado River Water Conservation District v. United States</u> , 424 US 800, 817 (1976), this Court should abstain from ruling on any aspect of this matter until after the Superior Court has determined the rights of the parties.  In <u>Colorado River</u>, the Supreme Court of the United States held that six factors are relevant when considering to whether to abstain: 1) whether the other Court has assumed jurisdiction over any res or property:  in this

19

case, the Superior Court has already assumed jurisdiction over the real property which is the subject of the plaintiffs complaint. Indeed, the Superior Court obtained jurisdiction because of the plaintiffs instituted the actions there.  The plaintiff chose the state forum.

2) the inconvenience of the federal forum:  this factor is neutral.

3) the avoidance of piecemeal litigation: It is hard to fathom how 30+ lawsuits could be considered other than piecemeal, however, if since they are in Superior Court, at least they are likely to be consolidated.  If this action is dismissed, it can be recommenced in state court and consolidated.  If the action is stayed, this Court will have the benefit of the State determination of the property rights and conflicting decisions may be avoided.

4) the order in which jurisdiction was obtained: clearly, the state court actions were begun first.

5) whether the state or federal law supplies the rule of decision: as set forth herein above, the rights of the parties shall be governed by state law not federal law.

6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction:  again as set forth herein above, if the state court ultimately determines that one party or the other is the rightful possessor of the properties, that will likely moot the remainder of the claims in this case. To the extent

20

that it does not, that determination will be a necessary predicate to the decision here. Accordingly, a stay of this action is appropriate.

## CONCLUSION

The defendants respectfully submit that the injunction sought by the plaintiff should be denied. The plaintiffs have not shown a likelihood of success on the merits, nor have they shown, or even attempted to show, that monetary damages would be insufficient. They have not shown, and cannot show, a balance of hardships in their favor. The plaintiffs have not shown and likely cannot show any customer confusion as a result of the defendants purchase and sale of unbranded gasoline products. As a result, the defense respectfully submits the plaintiffs cannot meet their burden under FRCP 65.

Further, this Court should not allow the plaintiff to multiply actions, increase costs and increase burdens on the state and federal court system. The parties should be encouraged to bring their claims in one form so that the disputes may be efficiently resolved without possibility of conflicting opinions.

Beyond all the legal niceties, the Court should look at the effect of the proposed injunction and the equity. No one suggests that the defendants were anything other

than faithful proponents of the Getty brand and the BP brand in this state until they were abandoned by the Oil Company. No one suggests that the defendants did anything to bring about the current state of affairs. In contrast, everyone understands that Getty is attempting to take advantage of the Bankruptcy to dispossess the defendants so that they can resell the defendants' businesses and their goodwill to the highest bidder. The worst part is that Getty refused to entertain any offers from the defendants. Given the economic realities of litigating against an Oil Company with almost infinite resources, the defense is not blind to the possibility that, even if the dealers are the rightful tenants, some Court may someday dispossess these unfortunate dealers. That said, the dealers are entitled to their day in court. This action seeks to deprive them of that day by collateral attack on their supplier. The litigation will drive up expenses and further render already severely damaged businesses further in the hole. One suspects the action has as much to do with spending the dealers' resources as it does the merits.

The plaintiffs seek to impose a standard on the dealers that the industry does not impose on itself. The plaintiffs rely on a reading of Court orders that is insupportable on its face. This is a case, were the facts, the law and the equities support the defense.

22

The injunction should be denied.

THE DEFENDANTS, HSTN, LLC and
RENALDI'S GETTY, LLC

By_____
    John J. Morgan
    BARR & MORGAN
    22 Fifth Street
    Stamford, CT  06905
    (203)  356-1595
    Juris No. CT13312

23

CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2012 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to any one unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

By:_____
    John J. Morgan (ct13312)
    Barr & Morgan
    22 Fifth Street
    Stamford, CT 06905
    Ph. (203) 356-1595
    Fx: (203) 357-8397
    Jmorgan@pmpalawyer.com